IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ENTERED
07/11/2011

| | | |
|---|---|---|
| In re:<br><br>BRYANT TURNER and WENDI JOHNSON TURNER,<br><br>Debtors. | § § § § § § § | Case No. 10-32706-H4-13 |
| BRYANT TURNER and WENDI JOHNSON TURNER,<br><br>Plaintiffs,<br><br>v.<br><br>FIRST COMMUNITY CREDIT UNION,<br><br>Defendant. | § § § § § § § § § § § § § | Adversary No. 10-03300 |

**MEMORANDUM OPINION REGARDING PLAINTIFFS'
COMPLAINT FOR TURNOVER AND DAMAGES**
[Doc. No. 1]

### I. INTRODUCTION

This Memorandum Opinion concerns a financial institution's right to freeze a depositor's account after the depositor has filed a Chapter 13 petition. Case law is clear that the financial institution may freeze an account without violating the automatic stay. However, the question in this suit is whether the institution may freeze the account indefinitely or whether it is required, once it freezes the account, to promptly seek a lifting of the automatic stay in order to effectuate a setoff of the account.

### II. PROCEDURAL AND FACTUAL BACKGROUND

1. On April 5, 2010, Bryant Turner and Wendi Johnson Turner (the Debtors) filed their Chapter 13 bankruptcy petition. [Main Case, Doc. No. 1].

1

2. The Debtors had a checking account, a savings account, and loans with First Community Credit Union (First Community). [Debtor's Ex. No. 30].

3. In their Schedule B – Personal Property, the Debtors listed $3,000 in a checking account. This property was described as a First Community Credit Union Checking Account. [Schedule B, Main Case, Doc. No. 23]. The Debtors listed this property as exempt pursuant to 11 U.S.C. § 522(d)(5). [Schedule C, Main Case, Doc. No. 23].

4. In their Schedule D – Creditors Holding Secured Claims, the Debtors listed First Community as having a lien on the Debtors' 2003 Nissan Altima. The amount of the claim without deducting the value of the collateral, was listed as $3,225.00. [Schedule D, Main Case, Doc. No. 23].

5. In their Schedule F – Creditors Holding Unsecured Nonpriority Claims, the Debtors listed First Community as having one unsecured claim in the amount of $1,837.00. [Schedule F, Main Case, Doc. No. 23].[1] According to the Debtors' schedules, the total amount of indebtedness owed to First Community, both secured and unsecured, was $5,062.00. On April 5, 2010, the Debtors actually had $5.58 in their savings account and $5,643.98 in their checking account. [Debtor's Ex. No. 30].

6. On April 8, 2010, the Debtors attempted to make a deposit in their checking account with First Community. They were unable to do so. The Debtors also attempted to withdraw funds on that same day. They were unable to do so; First Community had frozen the Debtor's funds. [Tape Recording, 4/20/11, 4:24:48 P.M.].

7. On April 8, 2011, Nicole Roberts (Roberts), an employee of First Community, and the sole employee within First Community's bankruptcy department, telephoned Wendi Johnson

---

[1] Two credit cards are listed but they have the exact same balance, leading this Court to believe that they are not separate debts, but rather one and the same debt which the Debtors erroneously scheduled twice.

2

Turner and spoke with her to inquire whether she would be paying her loans outside of the Chapter 13 bankruptcy.[2] [First Community's Ex. No. 8].

8. On April 9, 2010, the Debtors made a demand for their frozen funds, but First Community declined to unfreeze the funds. [Debtor's Ex. No. 17, p. 2]; [Debtor's Ex. No. 13].

9. Between April 16, 2010 and October 4, 2010, First Community withdrew $203.58 from the Debtors' account and applied these funds to pay down the Debtors' loans with First Community via an automatic bill pay that the Debtors failed to disable before filing for bankruptcy. First Community did not seek to have the automatic stay lifted to debit the Debtors' account (and has never subsequently sought to have the stay lifted). [Debtor's Ex. No. 31]; [Tape Recording, 4/20/11, 1:15:09 P.M.]. It was not the policy of First Community to cease automatic debiting upon the filing of a bankruptcy. [Tape Recording, 4/20/11, 1:59:31 P.M.]. The automatic bill pay was cancelled as of December 30, 2010. [First Community's Ex. No. 9]. First Community refunded the automatic debit withdrawals in October of 2010. [Debtors' Ex. No. 31].

---

[2] The term "under the plan" properly refers to any payment made pursuant to the provisions of a Chapter 13 plan, regardless of whether such payment is made through the trustee or by a debtor directly to a creditor. Unfortunately, over the years, certain nomenclature has evolved which has led to confusion over the meaning of the phrase "under the plan." The term "outside the plan" is bankruptcy parlance that has been used to describe a payment made by a debtor directly to a creditor without going through the Chapter 13 trustee. Some practitioners and courts believe that making a payment "outside the plan" means that the payment is not made "under the plan." *In re Gregory*, 143 B.R. 434, 427 (Bankr. E.D. Tex. 1992) (referring to "outside the plan" as treatment of creditors "not specified in or governed by the plan") (citing In re Evans, 66 B.R. 506, 511 (Bankr. E.D. Pa. 1986)). Conversely, the term "inside the plan" has been used to describe a payment made by a debtor through the trustee, and some practitioners and courts believe that only such payments as these are made "under the plan." This Court disagrees with both of these views. Every Chapter 13 plan which this Court has reviewed reflects which claims will be paid through the trustee and which claims will be paid directly by the debtor; therefore, when the plan is confirmed, all payments that are referenced in the plan, regardless of whether they are made by the trustee or directly by the debtor, are payments made "under the plan." For these reasons, the Court believes that the use of the terms "outside the plan" and "inside the plan" are confusing. Robert B. Chapman, *The Bankruptcy of Haig-Simons?*, 10 AM. BANKR. INST. L. REV. 765, 847 n.446 (2002). It would be preferable to discard the use of these two phrases and, instead, use the phrases "payments through the trustee" and "direct payments by the debtor"—all of which are payments made "under the plan."

10. First Community filed three proofs of claim in this bankruptcy case. Proof of Claim No. 3 was filed for $3,214.58, and represents that this debt is secured by the Nissan Altima. [Debtors' Ex. No. 5]. Proof of Claim No. 4 was filed for $943.86. [Debtors' Ex. No. 6]. This claim is also shown as secured by the Nissan Altima. Proof of Claim No. 6 was filed for $1,834.64. [Debtor's Ex. No. 7]. This claim is also shown as secured by the Nissan Altima. No proof of claim shows any checking or savings accounts at First Community as collateral. No proof of claim indicates that First Community would freeze the Debtors' account so as to setoff the funds at a later date. The total amount of debt owed to First Community, based on the proofs of claim, is $5,993.08

11. First Community intended to freeze the funds until the five-year Chapter 13 period for plan payments is over. [Debtor's Ex. No. 13].

12. First Community asserted that it removed the freeze on April 18, 2011—i.e., more than one year after it imposed the freeze on the funds. [Tape Recording, 4/20/11, 4:27:43 P.M.]. However, even after the freeze was removed, the Debtors could not access the funds. [Tape Recording, 4/20/11, 4:27:54 P.M.].

13. On July 7, 2010, the Debtors initiated the above-referenced adversary proceeding. [Adv. Doc. No. 1].

14. On February 9, 2011, counsel for First Community sent a letter to the Debtors stating the following: "As you may be aware, FCCU claims a right of setoff as to certain deposits in Debtors' accounts at FCCU. In the near future, FCCU intends to seek relief from the automatic stay in order to effectuate its right." [Ex. No. 16]. Included with the letter was a check in the amount of $1,459.91, which purported to be the amount of the Debtors'

4

deposits less the amount subject to First Community's setoff right. [Ex. No. 16, p. 2]. The check was dated December 10, 2010. [Ex. No. 16, p. 2].

15. On April 20, 2011, this Court held a trial as to whether First Community violated the automatic stay and whether the Debtors incurred any actual damages. Exhibits were introduced and testimony was adduced. The following persons testified: Nicole Roberts (Roberts), an employee at First Community who worked in the bankruptcy department; and the two debtors: Bryant Turner and Wendi Johnson Turner. On April 27, 2011, counsel for the parties made closing arguments and the Court took the matter under advisement.

16. At the beginning of the April 20, 2011 trial, the Court ruled from the bench that because counsel for the Debtors made woefully late disclosures to First Community's counsel about the basis for actual damages alleged by the Debtors, the Debtors would be prohibited from seeking damages concerning any medical expenses allegedly due to First Community's violation of the automatic stay, as well as any damages relating to the Debtors' inability to obtain a mortgage modification.[3] [Tape Recording, 4/20/2011 at 12:44:32 PM].

### III. CREDIBILITY OF WITNESSES

#### A. Nicole Roberts

The Court finds Roberts to be credible on only some of the issues about which she testified. By way of one example, Roberts testified that First Community had placed an administrative freeze on only a portion of the Debtors' deposits, totaling $2,985.98. [Debtor's Ex. No. 30]. However, First Community had no documentation confirming a partial freeze. [Tape Recording, 4/20/11, 1:00:14 P.M.]. Moreover, Wendi Johnson Turner credibly contradicted this testimony, testifying that she was unable to access any of the funds on deposit

---

[3] This Court notes that the Debtors' home loan was with Wells Fargo, not First Community, and it is Wells Fargo with whom the Debtors unsuccessfully attempted to negotiate a mortgage modification.

at First Community. [Tape Recording, 4/20/2011, 4:24:48 P.M.]. Accordingly, the Court gives only some weight to Roberts' testimony.

**B.     Bryant Turner**

The Court finds Bryant Turner to be very credible on all issues about which he testified. Accordingly, the Court gives substantial weight to his testimony.

**C.     Wendi Johnson Turner**

The Court finds Wendi Johnson Turner to be very credible on all issues about which she testified. Accordingly, the Court gives substantial weight to her testimony.

### IV. CONCLUSIONS OF LAW

**A.     Jurisdiction and Venue**

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(a). This particular dispute is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (C) and (O), and the general "catch-all" language of 28 U.S.C. § 157(b)(2). *See In re Southmark Corp.*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case."); *De Montaigu v. Ginther (In re Ginther Trusts)* Adv. No. 06-3556, 2006 WL 3805670, at *19 (Bankr. S.D. Tex. Dec. 22, 2006) (holding that an "[a]dversary [p]roceeding is a core proceeding under 28 U.S.C. § 157(b)(2) even though the laundry list of core proceedings under § 157(b)(2) does not specifically name this particular circumstance").

Having made this conclusion of law as to jurisdiction, this Court nevertheless notes that since the trial in this suit was concluded (at which time the Court took the matter under advisement), the Supreme Court of the United States has issued its watershed opinion of *Stern v.*

6

*Marshall,* No. 10-179, 2011 WL 2472792 (June 23, 2011). In *Stern,* the Supreme Court held that 28 U.S.C. § 157(b)(2)(C)—which authorizes bankruptcy judges to issue final judgments in counterclaims by the debtors' estate against entities filing claims against the estate—is an unconstitutional delegation of Article III authority to bankruptcy judges, at least when the dispute being adjudicated is based on state common law. *Id.* at *14. Because the Debtors' suit against First Community is in effect a counterclaim against this institution which filed proofs of claim in the Debtors' main case, at first blush it would appear that *Stern* is on all fours and therefore that: (1) this Court does not have the constitutional authority to enter a final judgment in this dispute; and (2) this Court must therefore submit proposed findings of fact and conclusions of law to the District Court, together with a proposed judgment to be signed by that Article III Court. However, for the reasons set forth below, the undersigned bankruptcy judge believes that he does have constitutional authority to sign a final judgment in this adversary proceeding.

First, in *Stern*, the suit between the debtor's estate and the creditor concerned state law issues. *Id.* at *19. In the suit at bar, the suit arises out of alleged violations of the automatic stay imposed by an express Bankruptcy Code provision—i.e. § 362(a). Moreover, the relief sought by the Debtors is based upon another express Bankruptcy Code provision—i.e. § 362(k), which expressly provides for recovery of damages by a debtor for a creditor's violation of the automatic stay. State law has no equivalent to these statutes; they are purely a creature of the Bankruptcy Code. Accordingly, because the resolution of this dispute is not based on state common law, *Stern* is inapplicable, and this Court has the constitutional authority to enter a final judgment in this suit pursuant to 28 U.S.C. §§ 157(a) and (b)(1).

Alternatively, even if *Stern* is applicable, this Court concludes that the one exception articulated by the Supreme Court applies. In *Stern*, the Supreme Court discusses a "public rights" exception to the general rule that only an Article III judge may exercise adjudicative authority. *Id.* at *15. The "public rights" exception is not well defined. The Supreme Court has stated that the application of Article III "is guided by the principle that 'practical attention to substance rather than doctrinaire reliance on formal categories should inform application of Article III.'" *CFTC v. Schor*, 478 U.S. 833, 853–54 (1986). In general, the "public rights" exception arises when "Congress selects a quasi-judicial method of resolving matters that could be conclusively determined by the Executive and Legislative Branches, [because] the danger of encroaching on the judicial powers is less than when private rights, which are normally within the purview of the judiciary, are relegated as an initial matter to administrative adjudication." *Id.* Although a public rights dispute may arise between two individuals, "it is still the case that what makes a right 'public' rather than private is that the right is integrally related to particular federal government action." *Stern*, 2011 WL 2472792, at *18.

This suit involves the adjudication of rights created under a complex public rights scheme, and therefore it falls within the Bankruptcy Court's constitutional authority. Under *Thomas v. Union Carbide Agricultural Products Co.*, a right closely integrated into a public regulatory scheme, even "a seemingly 'private' right," may be resolved by a non-Article III tribunal "with limited involvement by the Article III judiciary." 473 U.S. 568, 593 (1985). The Bankruptcy Code is a public scheme for restructuring debtor-creditor relations, necessarily including "the exercise of exclusive jurisdiction over all of the debtor's property, the equitable distribution of that property among the debtor's creditors, and the ultimate discharge that gives the debtor a 'fresh start' by releasing him, her, or it from further liability for old debts." *Central*

*Va. Cmty. College v. Katz*, 546 U.S. 356, 363-64 (2006); *see Northern Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 71 (1982) (plurality opinion) (noting in dicta that the restructuring of debtor-creditor relations "may well be a 'public right'"). *But see Stern*, 2011 WL 2472792, at *20 n.7 ("We noted [in *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 31, 56 n.11 (1989)] that we did not mean to 'suggest that the restructuring of debtor-creditor relations is in fact a public right.' . . . . Because neither party asks us to reconsider the public rights framework for bankruptcy, we follow the same approach here.").

Disputes that are integrally bound up in the claims adjudication process—and thus involve the exercise of the Bankruptcy Court's *in rem* jurisdiction over the estate—are part of the "public rights" exception. *See Stern*, 2011 WL 2472792, at *24 (noting that when determining whether Congress may bypass Article III, "the question is whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims adjudication process"). Disputes over rights created by the Bankruptcy Code itself as part of the public bankruptcy scheme also fall within the "public rights" exception. *See Thomas*, 473 U.S. at 593 (allowing non-Article III adjudication of rights created by a public regulatory scheme). The Bankruptcy Court may enter final judgments in these matters. This lawsuit relates solely to the automatic stay, a right established by § 362 of the Bankruptcy Code, and it falls within the Court's constitutional authority.

The automatic stay is one of the most important—if not the most important—features of the Bankruptcy Code, and it is integral to the public bankruptcy scheme. Its purpose is to enjoin all creditors from taking action against the debtor and the estate so that the debtor may have some breathing room to propose and obtain confirmation of a plan of reorganization which will pay creditors. *In re Chestnut*, 422 F.3d 298, 301 (5th Cir. 2005). A debtor has a fiduciary duty to

9

his creditors to take the action necessary to pay their claims. *See In re Mooney*, 2002 Bankr. LEXIS 1958 at *25 n.16 (Bankr. N.D. Tex. Nov. 26, 2002). Given the central role of the automatic stay in the bankruptcy scheme, the broad effect of the automatic stay, and the fiduciary duty imposed upon debtors, this Court concludes that enforcement of the automatic stay fits within the "public rights" exception. The automatic stay protects not just one person or entity, but rather protects all of those persons and entities affected by the filing of a bankruptcy petition. *In re Chestnut*, 422 F.3d at 301. The debtor and the estate benefit because the stay is an injunction that enjoins creditors from unilaterally attempting to collect their respective claims against the estate. *Campbell v. Countrywide Home Loans, Inc.*, 545 F.3d 348, 354–55 (5th Cir. 2008). Each of the creditors benefits because no other creditor may unilaterally take action against the estate—which means that the debtor has time to deliberately and carefully file a plan and then obtain confirmation so that all claims can be paid. *In re Chestnut*, 422 F.3d at 301. Stated differently, the existence of, and the benefits provided by, the automatic stay do <u>not</u> constitute a private right of any one specific person or entity, but rather comprise a public right that inures to the benefit of all those persons involved in a bankruptcy. Without the enforcement of the automatic stay, reorganization of consumer debtors and business debtors throughout the country would be impossible and would undermine the public policy of allowing honest debtors to obtain a fresh start. Accordingly, because the undersigned judge concludes that the dispute at bar involves a "public right," the undersigned judge concludes that he has the constitutional authority to sign a final judgment in this adversary proceeding.

Venue in the suit at bar is proper pursuant to 28 U.S.C. § 1409.

**B.      The Automatic Stay and Damages for Violating the Stay**

      1.      <u>The Automatic Stay and First Community's Violations Thereof</u>

10

A bankruptcy petition operates as a stay applicable to creditors attempting to recover "a claim against the debtor that arose before the commencement of the case." 11 U.S.C. § 362(a)(6).[4] Relief from the automatic can only be granted on request of a party in interest and after notice and a hearing. *Id.* § 362(d). Chapter 13 debtors who are injured by willful violations of the automatic stay shall recover actual damages—including costs and attorneys' fees—and may recover punitive damages if warranted. *Id.* at § 362(k)(1).

Clearly, at least two violations of the automatic stay occurred in the suit at bar. First, Roberts, an employee of First Community and the sole employee within the bankruptcy department, telephoned Wendi Johnson Turner to ask whether her husband and she would be paying their loans outside of their Chapter 13 bankruptcy. [Finding of Fact No. 7]. This telephone call violated the automatic stay, although the Debtors failed to prove any damages from this violation. Second, First Community continued to "auto-debit" from the Debtors' bank account certain amounts to pay off loans that the Debtors had taken out with First Community. [Finding of Fact No. 9]. These amounts, however, were paid back to the Debtors' account. [Finding of Fact No. 9]. Accordingly, while the stay was twice violated, neither action led to actual damages accruing.

    2.    <u>First Community Violated the Stay Because Exercising an Administrative Freeze in Order to Preserve a Right to Set Off Requires the Prompt Filing and Prosecution of a Motion to Lift the Automatic Stay</u>

A third action by First Community also violated the automatic stay, but like the other violations by First Community, did not result in actual damages. Despite the lack of actual damages, this Court does find First Community's actions disturbing. In the suit at bar, the

---

[4] Reference to a "Bankruptcy Rule" refers to the Federal Rules of Bankruptcy Procedure. Any reference herein to "the Code" refers to the United States Bankruptcy Code. Further, reference to any section (i.e. §) refers to a section in 11 U.S.C., which is the United States Bankruptcy Code.

11

Debtors allege that the automatic stay was violated when: (a) First Community placed an administrative freeze on their funds; (b) First Community never sought relief from the automatic stay; and (c) First Community froze the funds for **over one year**. First Community's policies unquestionably put it in danger of being liable for both actual and punitive damages.

First Community cites the case of *Citizens Bank v. Strumpf* for the proposition that creditors are allowed to impose an administrative freeze on an account when pursuing setoff. 516 U.S. 16, 21 (1995). *Strumpf* holds that an administrative freeze does not violate the automatic stay as it relates to 11 U.S.C. §§ 362(a)(3) or (a)(6).[5] Indeed, *Strumpf* holds that "reliance on these provisions rests on the false premise that [an] administrative [freeze] [takes] something . . . or exercises[s] dominion over property . . . . In fact, however, [an administrative freeze] consists of nothing more or less than a promise to pay, from the bank to the depositor." *Strumpf*, 516 U.S. at 21 (citing *Bank of Marin v. England*, 385 U.S. 99, 101 (1966)). Accordingly, an administrative freeze is "neither a taking of possession . . . nor an exercising of control over" a bank account, but instead, "merely a refusal to perform" a promise. *Id.*; *Calvin v. Wells Fargo Bank, N.A. (In re Calvin)*, 329 B.R. 589, 603 (Bankr. S.D. Tex. 2005). As such, neither § 362(a)(3) nor § 362(a)(6) apply in the suit at bar. Unfortunately for First Community, *Strumpf* only gets it two-thirds of the way there, as *Strumpf* also addresses § 362(a)(7).

11 U.S.C. § 362(a)(7) operates as a stay of "the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor." While the Supreme Court concluded that the creditor in *Strumpf* did not violate § 362(a)(7), it based its conclusion on two critical factors: (1) a motion for relief from the

---

[5] 11 U.S.C. § 362(a)(3) operates as a stay of "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." In turn, § 362(a)(6) operates as a stay of "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title."

automatic stay must be filed; and (2) the administrative freeze was not intended to be permanent, but only intended to continue so long as it was necessary to request from the bankruptcy court relief from the automatic stay. *Strumpf*, 516 U.S. at 19; *In re Hernandez*, No. 04-40178, 2005 Bankr. LEXIS 789, at *7 (Bankr. S.D. Tex. Apr. 27, 2005); *In re Calvin*, 329 B.R. at 603.

Stated differently, First Community ignored the *Strumpf* requirement that a creditor shall **promptly file a motion for relief from the automatic stay** and only apply the freeze so long as it takes the bankruptcy court to grant the appropriate relief requested. *Strumpf*, 516 U.S. at 19; *Town of Hempstead Emps. Fed. Credit Union v. Wicks (In re Wicks)*, 215 B.R. 316, 319–20 (E.D.N.Y. 1997) (holding that credit union which placed an administrative freeze on debtor's account but did not seek relief from the stay for four months violated the stay). In the suit at bar, First Community applied the administrative freeze on April 8, 2010. [Finding of Fact No. 6]. Here, the administrative freeze was kept in place **for over one year**—i.e. until April 18, 2011.[6] [Finding of Fact No. 13]. To this day, no motion for relief from the automatic stay has been filed, despite representations from First Community to the Debtors that it would do so. [Finding of Fact Nos. 9 and 16]. Therefore, First Community violated both *Strumpf* requirements by failing to promptly file a motion for relief from stay and then continuing the administrative freeze for a significant, if not indefinite, period of time. For these reasons, First Community willfully violated 11 U.S.C. § 362(a)(7).

    3.    The Debtors Failed to Prove That They Incurred Actual Damages As a Result of First Community's Violation of the Automatic Stay

"[Actual] damages under § 362(k) must be proven with reasonable certainty and may not be speculative or based on conjecture." *Dugas v. Claron Corp.*, No. 1:09-CV-990, 2010 WL

---

[6] Unlike the creditor in *Strumpf*, who only intended to place an administrative freeze on the bank account until a motion for relief from stay could be filed in order to minimize its losses and exercise its set off rights, First Community intended to continue the administrative freeze throughout the entirety of the Debtors' Chapter 13 case (*i.e.*, five years). *Strumpf*, 516 U.S. at 17–18; [Finding of Fact No. 11].

13

3338635, at *5 (E.D. Tex. Aug. 23, 2010) (quoting *Collier v. Hill (In re Collier)*, 410 B.R. 464, 476 (Bankr. E.D. Tex. 2009)). Therefore, although First Community willfully violated the automatic stay, the Debtors must still prove actual damages as a prerequisite to any damage award. *Id.*

Unfortunately, the Debtors have failed to do so. While the Court is sympathetic to the plight of the Debtors, the Debtors' attorney, through his own ambush-like tactics, precluded any chance of the Debtors being able to prove actual damages. Indeed, counsel for the Debtors waited until **the day before trial** to alert First Community's counsel as to the basis of the alleged actual damages, resulting in this Court excluding the mortgage modification and medical expenses as sources of actual damages. [Finding of Fact No. 16]. Moreover, even if this Court had not excluded evidence concerning the medical expenses and the Debtors' failure to obtain a mortgage modification, these damages are still speculative and conjectural. In sum, after reviewing the entire record, this Court comes to the same conclusion as did the Debtors' counsel with respect to the amount of actual damages (as outlined in the Debtors Proposed Findings of Fact and Conclusions of Law): "$_____" (Note: Debtors' counsel actually left a blank in his proposed Findings and Conclusions; Doc. No. 44, p. 5 of 7.). Just as the Court can find no amount of actual damages, Debtors' counsel was literally drawing a blank as to the amount of actual damages when he submitted his proposed findings and conclusions.[7]

In sum, for the reasons stated above, this Court finds that the Debtors have incurred no actual damages for any violations of the automatic stay. As such, this Court will award neither

---

[7] While Debtors' counsel made vague references to pre-judgment interest on the withheld funds as a source of actual damages, that alone is not enough to preserve a claim for pre-judgment interest—no exhibits were introduced, no testimony was adduced, and no briefing was done relating to pre-judgment interest. *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam) ("A skeletal 'argument,' really nothing more than an assertion, does not preserve a claim. Especially not when the brief presents a passel of other arguments . . . . Judges are not like pigs, hunting for truffles buried in briefs." (citation omitted)).

punitive damages nor attorney's fees. *In re Martinez*, 281 B.R. 883, 886 (Bankr. W.D. Tex. 2002) ("If there are no actual damages, then there can be no sanction.")

### V. CONCLUSION

There is no question that First Community violated the automatic stay. Fortunately for this instutition, because the Debtors failed to prove any damages, this is a case of "no harm, no foul." Indeed, it is no small coincidence that since the Debtors initiated this suit, First Community has changed its policies whenever a credit union member files a bankruptcy petition. First, all automatic debits are now stopped so as to prevent violations of the automatic stay. Second, when First Community places an administrative freeze on an account, it will either promptly request a lift of the automatic stay from the bankruptcy court in order to apply offset, or it will promptly unfreeze the account if a motion to lift the automatic stay is not sought. [Tape Recording, 4:20/11, 2:00:30 P.M.]. Thus, First Community has learned that its actions were inappropriate and has moved to take corrective action. This is a good thing.

It is probably, however, of small consolation to the Debtors. As the credible testimony revealed, they were rightfully distraught and upset about their inability to access funds in their account at First Community, which unquestionably intentionally violated the automatic stay by its actions towards them. Stress and anxiety alone, however, do not equate to actual damages; there must be more. While an unfortunate result, perhaps this suit will serve as a lesson for attorneys seeking damages for violations of the automatic stay: when a statute requires proof of actual damages in order to obtain relief, waiting until the day before trial to inform opposing counsel as to the nature and basis of those actual damages will not lead to a successful result for the client.

15

A judgment consistent with this Memorandum Opinion will be entered on the docket simultaneously with the entry on the docket of this Opinion.

Signed on this 11th day of July, 2011.

                                                      Jeff Bohm
                                                     United States Bankruptcy Judge